Joan BINGHAM, et al., Appellants/Cross–Appellees,

v.

GOLDBERG. MARCHESANO. KOHLMAN. INC., Appellee/Cross–Appellant.

GOLDBERG. MARCHESANO. KOHLMAN. INC., Appellant/Cross–Appellee,

v.

Joan BINGHAM, et al., Appellees/Cross–Appellants.

Nos. 89–CV–880, 89–CV–881, 89–CV–1141 and 89–CV–1112.

District of Columbia Court of Appeals.

Argued Jan. 28, 1991.
Decided Feb. 3, 1994.

---

Ellyn R. Weiss, with whom Richard A. Gross, Washington, DC, was on the brief, for appellants/cross-appellees.

Diana M. Savit, with whom Marvin L. Szymkowicz, Washington, DC, was on the brief, for appellee/cross-appellant.

Before STEADMAN, FARRELL, and WAGNER, Associate Judges.

WAGNER, Associate Judge:

Appellants, Joan Bingham and PFP, Inc. (PFP) appeal from a judgment against them, jointly and severally, in favor of appellee, Goldberg. Marchesano. Kohlman. Inc.[1] (GMK) for $74,195.48, as damages for breach of contract following a non-jury trial. The dispute arose out of GMK's unsuccessful efforts to collect from appellants sums claimed under a contract with PFP for advertising and marketing services rendered by GMK associated with launching *The Washington Weekly (WW)*, a newspaper originated by appellants and others. The trial court found that Washington Weekly Limited (WWL), a limited partnership, assumed the assets and liabilities of PFP and held that appellant Bingham, who was officially a limited partner in WWL, should be treated as a general partner pursuant to D.C.Code § 41–207 (1981) because she exercised control over partnership activities.

Appellants argue that the trial court erred first in imputing PFP's liabilities under the contract to the partnership, and secondly, in holding Bingham personally liable when, they contend, she was acting solely as agent for the general corporate partner of WWL and because there was no evidence that GMK relied on Bingham's involvement as a partner in WWL, which did not even exist at the time the parties entered the contract. Alternatively, Bingham argues that, assuming liability could be imputed to the partnership and that she became a general partner as of June 18, 1984, she can not be held personally liable for debts which accrued prior to that date. Appellants also challenge the trial court's pretrial imposition of sanctions against them. In its cross-appeal, GMK argues that the trial court erred in: (1) denying its claim for judgment for services rendered after June 30, 1984; (2) precluding it from asserting quantum meruit as an alternate theory of liability for services rendered after June 1984; (3) denying the full amount of attorney's fees and costs GMK requested for sanctions; and (4) denying its motion for additional sanctions. We reject the arguments made in the cross-appeal. With respect to the direct appeal, we hold that the trial court erred in imputing PFP's liabilities to the partnership and then to Bingham personally. Therefore, the judgment against Bingham is vacated in all respects. Otherwise, the judgment and orders appealed from are affirmed.[2]

## I.

### Factual Background

#### A. Formation of the Corporation and Limited Partnership

We recount in some detail the facts because they are essential to an understanding of the issues raised and the disposition reached. In June 1983, Jeffrey Stein, a journalist, interested appellant, Joan Bingham, in starting a weekly Washington newspaper, and they developed a prospectus to present to other potential investors.[3] Subsequently, Bingham, Mortimer Zuckerman, and Anne Peretz invested $50,000 in seed money to explore the feasibility of publishing the paper.[4] They enlisted the support of other investors and formed PFP, Inc., a corporation, to carry out the idea.

At an organizational meeting in September 1983, Bingham, Zuckerman, and Martin Peretz were named interim directors. James Glassman, who became acting publisher of the newspaper during the pre-publication phase, was named secretary. Bingham was

---

1. Formerly Goldberg/Marchesano and Associates Inc.

2. GMK amended the complaint several times. Bingham and PFP, Inc., individually and, apparently, as purported general partners in WWL, were the only remaining defendants at the time of trial. Although PFP, Inc. was formally named in the notice of appeal, appellants' brief focuses primarily on the liability of Bingham. Given our conclusion with respect to the absence of liability of the partnership for the GMK debt by operation of law, the judgment against PFP, Inc. is affirmed only insofar as it imposes liability against the corporation in its individual capacity and not as general partner of WWL.

3. Bingham served on the Board of Directors of the *Louisville Courier Journal*, a large newspaper.

4. Zuckerman was then a principal owner of *U.S. News & World Report* and *The Atlantic Monthly*, inter alia. Anne Peretz was married to Martin Peretz, the owner of *The New Republic*.

voted PFP's president, and Glassman was voted to serve as its vice president, treasurer and secretary. The corporation authorized the acceptance of an offer of purchase of the following number of shares of stock at a par value of $1.00 each by the following individuals: Bingham, 17,500; Anne Peretz, 13,750; and Zuckerman, 18,750. In December 1983, the shareholders authorized an increase in PFP's shares in order to fund the next phase of the project, which included development of an organization to produce the paper and to undertake a subscription drive. Bingham purchased $427,500 in shares; Anne Peretz, $125,500; Peretz Family Investments, $100,-000; Zuckerman, $100,000;[5] and Martin Peretz, $7,000.

In April 1984, PFP signed a lease for rental of office space for the operation at 2028 P Street, N.W. in Washington, D.C. Stein, Bingham, Glassman, and James Rice, who was hired as associate publisher and general manager of the paper in early 1984, signed the lease "corporately and personally." Bingham became publisher and moved into the new offices around the time the first issue of *WW* was published in June 1984.

James Glassman testified that the limited partnership, WWL, was formed to raise additional capital for the project. The partnership agreement was entered in the District of Columbia on March 1, 1984. Initially, PFP was listed as the general partner, and Susan Greenberg was listed as the sole limited partner. Appellant Bingham signed the certificate and agreement of limited partnership as president of PFP, the corporate general partner.[6] On June 18, 1984, the partnership agreement was amended, and several new limited partners were added.[7] Appellant Bingham was listed in an annex to the agreement as the general partner whose total capital commitment was $1,022,727, with an initial capital contribution of $200,000. However, Bingham signed the amended filing as president of the general partner, PFP, and the body of the amended agreement specifies that PFP, Inc., a District of Columbia corporation, is the only general partner.[8] The agreement was amended a second time on June 21, 1984 to add another limited partner, but the apparent error in the previous annex listing Bingham as a general partner was not corrected.

The amended agreement of June 18th provides for PFP to exercise the "power and authority to do or cause to be done any and all acts deemed by the general partner to be necessary" for the management and control of the affairs of the partnership.[9] The partnership agreement precludes limited partners from participating in the management of the partnership and from representing, signing, or binding the general partner or the partnership.

The amended agreement also provided for the general partner to make its capital contribution of $1,022,727, as set forth in the annex to the agreement, in the following way: (1) the newspaper properties, upon forma-

5.  James Glassman testified that Zuckerman made two investments of $50,000 each. The second was made well after all the other shareholders had invested.

6.  The agreement provided that up to $1,500,000 could be raised through the sale of additional limited partnership interests. PFP contributed to the partnership "newspaper properties" it had developed for the project which were valued at $127,693 prior to the partnership's formation date. These properties consisted of "prototypes of the newspaper, market research results, and direct mail results." PFP received in exchange a 99.9 percent interest in the partnership. PFP retained $78,830.74 in its own bank account to pay its ordinary business expenses.

7.  Seven investors were listed as limited partners, who were shown to be making an initial total capital contribution of $130,000, with individual capital obligations ranging between $25,000 and $10,000 each for a total of $325,000. Susan Greenberg withdrew in exchange for the return of her capital contribution.

8.  Bingham argues on appeal that her designation as a general partner was in error, as she was only a limited partner, and that the body of the agreement refers to only one general partner, PFP. She offered no testimony at trial; however, the agreement is in evidence.

9.  The agreement provided for the partnership to enter a management agreement with the general partner for a fee. The evidence shows that PFP waived these fees because the venture never generated sufficient cash to pay them. The management agreement was not in evidence at trial.

tion;[10] (2) from March 1, 1984, the partnership's formation date, through June 18, 1984, the effective date of the amended partnership agreement, the amount of cash necessary to maintain partnership operations; (3) from the effective date, amounts up to $300,-000 as necessary to maintain the partnership's operations until October 1, 1984; and (4) additional cash "as necessary to meet the General Partner's Capital commitment" and to maintain its interest in the partnership at 45% as limited partners made capital contributions. The partnership was to pay "all salaries and associated costs of employees and all other goods or services reasonably required in the management and publication of *The Washington Weekly*." Under the partnership agreement, all of the partnership's assets were to be applied to payment of such expenses before recourse could be had to the general partner, PFP.

James Glassman, the acting publisher through the pre-publication phase, testified at trial that PFP did not transfer any of its liabilities to the limited partnership for business and tax reasons.[11] He also testified that PFP retained $78,872.74 in cash when it transferred the newspaper properties to the partnership. Glassman said he believed that PFP paid some bills generated by the project even after the partnership's formation and that the partnership may also have paid some bills. He explained that some of the funds raised from PFP shares, which were sold to Bingham, Zuckerman, and the Peretzes in and after December 1983, were invested into the partnership as the corporate general partner's additional capital contributions.

Glassman also testified that as acting publisher in the start-up phase of the paper, he was the principal decision-maker, subject to the control of PFP's Board of Directors. He stated that Joan Bingham was the most active of the three principal investors and that she also had decision-making authority. However, Glassman said that in the event he had a disagreement with Bingham, the issue had to be resolved by PFP's Board, which could overrule Bingham. According to Glassman, Bingham's interest was principally on the editorial side during the start-up phase, and she would not spend any money without asking him first because of her limited business experience.

Jeffrey Stein, *WW*'s editor, left *WW* in October 1984 because of disagreements over editorial policies.[12] He testified that there were three principal owners of the paper, Bingham, Martin Peretz, and Zuckerman, all of whom had strong views on its editorial content. He said that decision-making at *WW*, including hiring, firing, and leasing decisions, was a collaborative process, but that Glassman was the principal operations officer. According to Stein, he suggested to Bingham that she take responsibility for the book review section of the newspaper. Bingham also made out checks, according to Stein, and there was evidence that James Rice also signed some checks for WWL. Kristine Kohlman, GMK's media director and executive vice president, described James Glassman as the head or point-man at the newspaper.[13] She testified that Glassman told her that Bingham had to sign-off on the creative materials developed by GMK.

### B. GMK's Contract

In late 1983, prior to the formation of the limited partnership, but after PFP's incorporation, James Glassman held preliminary discussions with GMK's chairman, Norman Goldberg, about hiring GMK to assist with advertising and marketing the newspaper. According to Goldberg, Glassman told him that a group of investors, including Bingham, Zuckerman, and Peretz, were backing *The Washington Weekly*. Goldberg said he be-

10. *See supra* note 6.

11. The original partnership agreement contains no provision for the partnership's assumption of any liabilities or operating expenses of the business.

12. Stein testified that he would receive daily comments from Bingham, Martin Peretz, Mor-timer Zuckerman, and James Glassman. He said he left because Peretz and Zuckerman disagreed with some of his editorial decisions.

13. James Glassman signed checks for PFP, at least in early 1984, including checks to "Goldberg, Marchesano."

lieved Glassman mentioned having some interest in it also.[14] Goldberg testified that "I thought it was a partnership of people. It was a group of investors in the way [Glassman] said it." Subsequently, Goldberg testified that Glassman never described the relationship as a partnership; however, he was confronted with an affidavit in which he averred, "Mr. Glassman referred to the group's organization as a partnership on more than one occasion, and we believe that to be the case." Goldberg then said that Glassman referred to the group as a partnership, explaining that he viewed a group of investors and a partnership to be synonymous.

Goldberg testified that he heard the name "PFP" around December 1983, although he did not know the exact legal nature of the entity. He said he never heard of the partnership's name, WWL, until after GMK filed suit. Goldberg said that he relied on Glassman during the contract negotiations. He also testified that he met Bingham for the first time after GMK was hired.[15] He admitted that Bingham never represented herself to be a partner of Glassman, Martin Peretz, and Zuckerman.

After several meetings, GMK sent Glassman a written document signed by Carole Marchesano, President of GMK, covering its proposed advertising and marketing services for the six months from January 1, 1984 through June 30, 1984. After a couple of weeks, Kristine Kohlman, GMK's executive vice president and media director, called Glassman to inquire about the status of the proposal, and Glassman explained that he would return it with an addendum. Glassman and Marchesano subsequently signed the addendum which essentially placed the contract on a month-to-month basis rather than on a six-month term as proposed originally.[16] Glassman wrote to GMK on January 20, 1984 stating that he could not "sign anything that commits *PFP* long-term" because of problems with a reluctant shareholder which had delayed full capitalization of the company. Neither side disputes that PFP never gave the go-ahead for the six-month commitment.

After the contract was executed, GMK developed a media campaign for *WW*, and the first issue of the paper was published in June 1984. Goldberg testified that GMK provided services after June 30, 1984, monitoring the commercial and media schedules and developing a potential list of advertisers. Goldberg also testified that he met with Bingham in September at her request to discuss the need for more advertising. According to Goldberg, GMK provided various services up to September 7, 1984. Kristine Kohlman testified that there was an extension of the contract after June for a three-month period, and she thought that Glassman had agreed to GMK's continued services. She said that James Rice, associate publisher and general manager of *WW*, requested the development of a sales kit after June 30th with which she helped.

James Rice, *WW's* general manager, testified that in response to GMK's concern over outstanding invoices, he sent a letter to GMK over Bingham's signature, listing her as publisher, on August 28, 1984, terminating the monthly retainer agreement with GMK and assuring GMK that the outstanding invoices would be paid. In a handwritten note on *Washington Weekly's* letterhead, dated September 27, 1984, Bingham wrote to Norman Goldberg confirming the prior letter terminating the monthly retainer agreement. The letter concluded with the following: "We really appreciated all your good advice last week."

---

**14.** Other evidence showed that Glassman had no interest.

**15.** Goldberg stated that he met Bingham again in September 1984 after she called to request a meeting to discuss how they could attract more advertisers.

**16.** The addendum read:
  PFP, Inc., publisher of Washington Weekly, accepts the terms of the six-month contract.

However, until we officially notify GMK that PFP, Inc. is funded and will definitely go ahead with publication of WW, we want to be on a month-to-month basis, without a six-month commitment. When we notify you, we will go ahead with the full contract.
  We also reserve the right not to go ahead with WW, in which case we will have no commitment beyond the month that we decide not to go ahead.

William Schmidt, GMK's comptroller, testified that GMK received a total of $79,369.75 in payments under the contract between February and September 1984. GMK claimed that several invoices remained unpaid for work performed through June 30, 1984: (1) Invoice No. 617 dated June 22, 1984 for $10,534.00 (for services performed between June 11 and 17, 1984); (2) Invoice No. 632 dated June 27, 1984 for $9,126.38 (for work performed prior to June 18, 1984); and (3) Invoice No. 758 dated July 27, 1984 for $19,234.70, for which no dates are specified. The unpaid invoices for work GMK claimed it performed after June 30, 1984 included the following: (1) Invoice No. 702 dated July 1, 1984 for $2,500 (July retainer fee)[17]; (2) Invoice No. 807 dated August 6, 1984 for $2,500 (August retainer fee); and (3) Invoice No. 847 dated September 7, 1984 for $2,761.25 (July client consultation and media work for an unspecified period).

## C. Trial Court Rulings

In granting judgment for appellee, the trial court made the following findings: (1) the written contract was between GMK and the corporation, PFP, rather than the partnership, Bingham, or any other individual; (2) the parties operated on a month-to-month basis pursuant to the contract; (3) liability under the GMK contract was transferred from the corporation, PFP, to the partnership, WWL, by operation of law upon the partnership's formation on March 1, 1984, although PFP was not absolved of its liability under the contract; and (4) the evidence was overwhelming that Bingham took part in the control of the partnership business and was therefore liable under the plain language of D.C.Code § 41–207 (1981).[18] The court also

found that Bingham had become a limited partner in WWL on June 18, 1984 and that she continued to exercise control over the business at all relevant times thereafter. The court determined that the fact that Bingham was acting for the corporate general partner did not alter the effect of D.C.Code § 41–207, which imposes general partnership liability on limited partners who take part in the control of the business. Appellants argued in the trial court that the statute then in effect implicitly required proof that GMK relied on Bingham's apparent partnership role before liability could be imposed. The court rejected this argument with the following explanation:

First of all, the plain language of the statute ... makes no reference to reliance, or notice, or knowledge.... The reason that GMK did not know that Ms. Bingham was acting as a general partner and, therefore, couldn't rely on it was because plaintiff didn't know about the partnership.... Plaintiff did know, however, that Ms. Bingham was exercising control and relied on that and defendants should not be allowed to profit from their failure to disclose the partnership status, which would be the consequence of their position on this point.[19]

Finally, the court found that the contract extended from January 1, 1984 through June 30, 1984 and that appellee had to prove the existence of an oral contract, express or implied, beyond June 30, 1984, which it failed to do. The trial court also ruled that under the plain language of the contract, liability for the invoices arose as of the date they were rendered by GMK.[20] Since the three invoices underlying the judgment were rendered

17. The record reflects a payment on July 17, 1984 from *"The Washington Weekly"* account, check no. 618 for the July retainer.

18. D.C.Code § 41–207 read at the relevant time as follows:

A limited partner shall not become liable as a general partner *unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.*

Section 41–202 (1981) provided that *"limited partners as such shall not be bound by the obligations of the partnership."*

19. The current law, D.C.Code § 41–433(a) (1987), provides:

If the limited partner does participate in the control of the business, the limited partner is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner.

20. Appellee argued that the contract provision which stated that "[a]ll invoices are due upon receipt" meant that the liability arose only when the invoices were sent.

after the date that the court determined that Bingham assumed the status of general partner, *i.e.,* no later than June 18, 1984, the court held her personally liable for the debt.

The trial court precluded appellee from pursuing a claim for the work performed after June 30, 1984 on a theory of quantum meruit because pretrial orders entered by a prior judge precluded it. In view of its holding that Bingham was liable under the partnership statute, the trial court did not reach appellee's theory of liability based on piercing PFP's corporate veil.

## II.

### A. Standard of Review

■■■■ The trial court's findings of fact in a non-jury trial will be set aside only if clearly erroneous or without evidentiary support. D.C.Code § 17–305(a) (1989); *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992); *Wheeler v. Goulart,* 593 A.2d 173, 173–74 (D.C.1991); *Westbridge Condominium Ass'n, Inc. v. Lawrence,* 554 A.2d 1163, 1166 (D.C. 1989). "[W]here the facts admit of more than one interpretation, the appellate court must defer to the trial court's judgment." *Davis v. United States,* 564 A.2d 31, 35 (D.C. 1989) (citations omitted). Our review of the trial court's legal conclusions is *de novo. Id.;* *Westbridge,* 554 A.2d at 1166. Determinations of fact-free principles of law are designated questions of law and require an independent appraisal of the record on appeal without deference to the trial court's findings. *Davis,* 564 A.2d at 35.

Appellants contend that two of the issues essential to the judgment against them involve questions of law subject to *de novo* review by this court. Specifically, they contend that the trial court erred as a matter of law in imputing the preexisting corporate contract obligation to the partnership under the undisputed facts, and in holding appellant Bingham liable as a general partner by operation of law.

### B. Imputation of Corporation's Liability to the Partnership

Appellants argue that the trial court erred in the first instance in imputing PFP's corpo-

rate obligation under the contract to WWL, the partnership. They contend that this ruling is contrary to the undisputed evidence and erroneous as a matter of law. The trial court imputed a transfer of liability to WWL for PFP's obligations under the GMK contract by operation of law from the date of the partnership's formation, March 1, 1984. The factual findings underpinning the court's ruling were these: (1) PFP and the partnership had the same business; (2) the significant persons in the corporation remained as significant persons in the partnership; (3) PFP made no arrangements to meet its obligations under the contract, although it continued to operate under it through June 30, 1984; and (4) PFP failed to inform GMK that it was no longer dealing with the same legal entity. In concluding that successor liability should be imposed on the partnership, the trial court relied on three cases, namely: *Colonial Ice Cream Co. v. Southland Ice Utilities Corp.,* 60 App.D.C. 320, 53 F.2d 932 (1931), *Bishop v. Dura–Lite Mfg. Co.,* 489 F.2d 710 (6th Cir.1973) and *Brockmann v. O'Neill,* 565 S.W.2d 796 (Mo.App.Div. 1 (1978)). Appellants contend that, unlike this case, each of these cases involved fraudulent conveyances which the original corporation made for the purpose of evading its creditors. Appellee contends that the cases are analogous to this case because each imposed successor liability based upon a "before and after" comparison of how the businesses of the buyers and sellers operated which revealed no essential differences. In any event, appellee argues, the evidence in this case established fraudulent transfers, although the trial court made no finding to that effect.

■■■■ Ordinarily, a business entity which acquires the assets of another business is not liable for its predecessor's liabilities and debts. *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1456, *reh'g denied,* 765 F.2d 154 (11th Cir.1985) (citations omitted). There are several recognized exceptions to this general rule. Liability will be imposed on the successor entity when

(1) the buyer expressly or impliedly agrees to assume such debts; or (2) the transaction amounts to a de facto merger

of the buyer and seller; or (3) the buying corporation is a "mere continuation" of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.* (quoting *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1329–30 (9th Cir.1975)); *see also Baltimore Luggage v. Holtzman*, 80 Md.App. 282, 562 A.2d 1286, 1289–90 (1989), *cert. denied*, 318 Md. 323, 568 A.2d 28 (1990); *Brockmann, supra*, 565 S.W.2d at 798. There is no dispute that the first two exceptions are not involved here. The trial court relied principally upon the "continuation" exception to the general rule against successor liability in imputing liability to WWL for PFP's obligations under the GMK contract. We review first the cases relied upon by the trial court and then their applicability to the facts and issues involved here.

We note at the outset that *Colonial Ice Cream, Brockmann,* and *Dura–Lite* are materially distinguishable from the case before this court. In each of these cases, the transferring or selling entity ceased to exist in fact or in effect, and the transferee literally continued the business of the transferor. In *Colonial Ice Cream,* the seller corporation, Zero Products, Inc. (Zero Company) sold all of its assets, including its plant, stock in trade, fixtures, patents, machinery, other property, and good will to the successor company, Zero Ice Cream Company (Colonial).[21] 53 F.2d at 933. In exchange, the buyer, Colonial, assumed the seller corporation's liabilities, up to a certain amount, and gave the seller 1,785 shares of its second preferred capital stock. *Id.* The creditor, Southland Ice Utilities Corporation (Merchants),[22] contended that the seller and buyer companies, Zero and Colonial, were essentially the same company, having substantially the same stockholders and officers, and that consolidation of their assets was, in effect, a merger.[23] *Id.* The appellate court agreed, concluding essentially that the purported sale was no more than a continuation of the seller's business under a new name and that the mere retention by the predecessor company of its corporate charter after the transfer of its assets did not make it any less extinct as an active entity. *Id.* at 934. Therefore, the court sustained the trial court's determination that the creditor of the seller corporation could follow the seller's assets to the successor company, which was deemed to hold them in trust for the payment of creditors. *Id.*

In *Brockmann*, the creditors sued the trustees of the assets of a former corporation, Royal Electric Contractors, Inc. (Royal), on a promissory note for $10,000. 565 S.W.2d at 797. Subsequent to incurring the debt, Royal had ceased operations, and its owners formed a second corporation, Consolidated Electrical Contractors, Inc. (Consolidated), which took over performance of Royal's contracting projects, using Royal's employees, trucks, and equipment. *Id.* at 797–98. In the meantime, Royal sold its trucks and other assets to an individual who became a director of Consolidated in consideration for the amount of back taxes which Royal owed the government before ceasing operations. *Id.* at 798. Neither the contractors doing business with Royal nor Royal's employees were notified of the formation of the successor corporation. *Id.* Although the trial court found in *Brockmann* that there was sufficient consideration to validate Royal's sale of its assets and that no fraud or merger was shown, the appellate court reversed, finding that there was no significant difference in the selling and purchasing entities, that there was no actual change of ownership, and that a continuation occurred. *Id.* at 798–99. The *Brockmann* court was persuaded by the reasoning in *Dura–Lite* upon which the trial court also relied here. *Id.* at 799.

---

**21.** Zero Ice Cream Company changed its name to Colonial Ice Cream Company; thus, it is referred to as Colonial in the cited opinion. *Colonial Ice Cream, supra,* 53 F.2d at 933.

**22.** Southland changed its name to Merchants Co. during the proceedings, and it is referred to as Merchants in the opinion of the court.

**23.** Although the de facto merger and "mere continuation" exceptions to the general rule against successor corporate liability have similar characteristics, courts generally treat them separately. *Bud Antle, supra,* 758 F.2d at 1457.

In *Dura–Lite,* the creditors obtained a money judgment against National Outdoor Display, Inc. (National) and National's president. 489 F.2d at 711. In order to satisfy the judgment, the creditors sought to attach an aircraft which National had transferred to Dura–Lite Manufacturing Co. (Dura–Lite) during the pendency of the creditors' law suit against National. *Id.* The trial court made findings that National and Dura–Lite had the same president, were engaged in the same business, used the same assets and equipment, and operated from the same premises and that National had transferred the aircraft for well below its market value. *Id.* Therefore, the court concluded that Dura–Lite had been formed with the intent to escape liability on the debts previously accumulated by National. *Id.* The Sixth Circuit affirmed, holding that the buying corporation was merely a continuation of the selling corporation. *Id.* at 711–12. The applicable state law provided that "a new corporation which is merely the continuation of an old one and which was formed in order that the old corporation could escape liability on its debts shall be deemed to have assumed the debts and liabilities of its predecessor." *Id.* at 711 (internal quotation marks and citation omitted).

In contrast, in the case before this court, the undisputed evidence showed that PFP continued to exist as a separate entity after the formation of WWL, the limited partnership. PFP's principals held board meetings, signed leases for partnership office space, and transferred substantial funds into the partnership through late 1984. It is undisputed that PFP retained cash assets of more than $78,000 and continued to pay bills after the partnership's formation. Although there were several principal investors in PFP, only one of PFP's principals, Joan Bingham, took part in the partnership's business on a regular basis. PFP filed its own tax returns through 1986 and maintained separate books.

In all of the cases relied on by the trial court, the transferring entity ceased to exist.

Even in *Colonial Ice Cream,* where the transferring entity retained its corporate charter, the court found that the company effectively had ceased to exist. That is not the case here. The partnership was formed to obtain investors and to raise capital through different investors to fund production of the newspaper, not merely to continue the corporation's business.[24] Although PFP's purpose became to act as general partner and to serve as management agent for the partnership under the terms of the partnership agreement, the partnership's purpose was separate and distinct from that of PFP.

■■ A number of factors must be examined to determine whether one business is a mere continuation of a predecessor. Among these are a common identity of officers, directors, and stockholders in the purchasing and selling corporations. *Bud Antle, supra,* 758 F.2d at 1458–59. While this factor is a key element in examining transactions between two corporations, its applicability is less useful in considering a situation where the claimed successor is a partnership for which the alleged predecessor corporation serves as corporate general partner.[25] In such a case, the officers for the corporation and for the corporate general partner would necessarily be the same. Therefore, other factors must be considered. Of some significance to our determination is the fact that there were many different limited partners in the partnership who were not shareholders in the corporation. Therefore, we do not view the identity of officers for the corporation as the officers of the corporate general partner to be sufficient on these facts to establish that a continuation occurred. Such an obvious occurrence when the predecessor corporation is the corporate general partner of the partnership is not sufficient to require ignoring the separate identities of the corporation and the partnership and imposing liability on the latter for the former's debts.

---

**24.** Under the partnership agreement, PFP retained the right to invest in other businesses.

**25.** While not explicitly provided for in the partnership statute in effect at the times relevant to this case, the statute did not preclude a corporation from being a general partner in a limited partnership.

■ Another factor of importance to the determination is the sufficiency of the consideration passing from one entity for the sale of its interest to another. *See Baltimore Luggage, supra,* 562 A.2d at 1294. The trial court made no finding that the corporation, PFP, gave inadequate consideration for the interest it purchased in the partnership, WWL. The undisputed evidence shows that the corporation originally contributed properties valued at $127,693 to the partnership. Both the general and limited partners contributed cash to the partnership over time.

A major factor relied upon by the trial court in imposing successor liability was its finding that PFP failed to arrange to meet its contractual obligations. This finding is contrary to the undisputed evidence, and therefore, we can not accept it. *See Byrd, supra,* 614 A.2d at 30. The evidence shows that PFP retained cash assets of $78,830.74 for business expenses after the transfer of properties. Under the partnership agreement PFP could anticipate earning management fees from the venture. It also expected to receive a share of the profits from the venture. The fact that the venture failed ultimately is not determinative of whether the corporation took steps to meet its financial obligation upon the transfer of some of its assets. Moreover, GMK was paid more than $77,000 in payments after the partnership was formed. Therefore, it cannot be said that the transaction was entered by PFP to avoid liability for its debts. *See Dura–Lite, supra,* 489 F.2d at 711 (new corporation deemed to assume liabilities of predecessor where formed to escape liability of former corporation). Both PFP and WWL paid their debts as long as each had cash to do so.

Another factor relied upon by the trial court in concluding that a mere continuation

occurred is that PFP and the partnership had the same business. However, "[i]n determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the seller—not whether there is a continuation of the seller's business operation." *Bud Antle, supra,* 758 F.2d at 1458. Thus, the fact that both were involved in some phase of the development of the weekly newspaper is not the key factor. Rather, it is whether entities involved remained separate. *See id.* As we have observed previously, two distinct entities existed during the transactions, a corporation and a limited partnership, and no circumstances have been shown which suggest that their separate identities should not be respected.

■ In summary, we conclude that the undisputed facts fail to show a basis for application of any of the four exceptions to the rule against successor liability. *See Bud Antle, supra,* 758 F.2d at 1456. Therefore, the trial court erred in imputing the liability of the corporation under the GMK contract to the partnership.[26] Accordingly, its determination that Bingham became personally liable on the GMK contract because she was a limited partner who took part in the control of the business, cannot be upheld.[27]

## C. Piercing PFP's Corporate Veil

■ Appellee argues that the trial court's decision should be affirmed because personal liability should be imposed upon appellant Bingham by piercing PFP's corporate veil. Appellee contends that Bingham used the corporation as an alter-ego and so dominated its affairs that she should be subject to personal liability for the debt owed by PFP to GMK. The trial court made no findings

26. The trial court found that the written contract was between GMK and the corporation and not between GMK and the partnership, Bingham, or any other individual. This factual finding is supported by the evidence, and the parties do not challenge it.

27. In view of our disposition of this issue, we need not reach the question of whether Bingham became liable as a general partner under prior law, D.C.Code § 41–207 (1981), because she exercised some control of the partnership as an officer or agent for the corporate general part-

ner. *See Delaney v. Fidelity Lease Ltd.,* 526 S.W.2d 543, 545 (Tex.1975); *but see Frigidaire Sales Corp. v. Union Properties, Inc.,* 88 Wash.2d 400, 562 P.2d 244, 246 (1977) (en banc) and *Western Camps, Inc. v. Riverway Ranch Enters.,* 70 Cal.App.3d 714, 727–28, 138 Cal.Rptr. 918, 926 (1977). For the same reason, we need not consider whether Bingham was a general partner in WWL because she was reported as such on an annex to, although not in the body of, an amended restated certificate of partnership.

which would support the imposition of liability on this theory. Nevertheless, as appellee points out, this court may affirm on grounds shown by the record, whether or not relied upon by the trial court. *See Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C.1982); *Joseph H. Munson Co. v. Secretary of State*, 294 Md. 160, 448 A.2d 935, 939 (1982), *aff'd*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Therefore, we consider briefly whether the record provides any possible support for a trial court finding in favor of appellee's claim.[28]

The general rule has been that the corporate entity will be respected and that its obligations will not be imposed upon a particular individual unless a "party seeking to disregard the corporate entity has proved by affirmative evidence that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong." *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C.1984) (citations omitted). We have recognized a modification to this rule which rejects the requirement that fraud must be shown. *Id.* Instead, considerations of justice and equity may justify piercing the corporate veil. *Id.* Whether there is a sufficient showing of a unity of ownership and interest will depend upon such factors as (1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors. *Id.* at 816.

When the evidence is viewed against these standards, there is no basis to conclude that there was a unity of ownership and interest. The record contains numerous documents evidencing the corporation's observance of corporate formalities. Among them are copies of the articles of incorporation, the D.C. Certificate of Incorporation, the Resolution for Bank Accounts, minutes of meetings of the Board of Directors and of shareholders, consent to postponement of meeting, corporate by-laws, and stock certificates. The

undisputed testimony shows that final decision-making authority rested with the Board of Directors of the corporation, and it was the Board's decision to terminate publication of the paper.

There is also no evidence that Bingham's personal funds were commingled with the corporation's assets or that the corporation made a preferential payment to her. What the evidence shows is that, in addition to her capital contribution to the corporation, Bingham loaned the corporation $300,000 and that she later forgave the debt. Contrary to appellee's assertion, there is no evidence that Bingham actually seized the corporation's computer equipment, although there is evidence that she had a security interest in it. Thus, we do not agree with appellee that there was either a commingling of assets or a preferential payment.

Finally, there is no basis to conclude that the corporation was undercapitalized initially or that the transfer of assets to PFP was undertaken as a fraud on creditors. On the contrary, cash in excess of one million dollars was invested into the corporation initially. For the reasons previously stated, we find no attempt to defraud creditors in the formation of WWL and PFP's purchase of a general partnership interest in the partnership. Thus, the basic elements for disregarding the corporate entity are absent here. *See Vuitch, supra*, 482 A.2d at 816. Accordingly, the trial court's ruling imposing personal liability upon appellant Bingham cannot be premised upon piercing the corporate veil.

### III.

*Post-June 30th Services and Quantum Meruit Ruling*

GMK contends in its cross-appeal that the trial court erred in denying recovery for services rendered after June 30, 1984 based upon an express or implied contract and in declining to consider its claim based upon a theory of quantum meruit. The trial court found that appellee failed to prove the existence of an oral contract after June 30th,

---

28. By not seeking a remand to the trial court for findings of fact on this issue, appellee concedes that for it to prevail on the point, the record must justify disregard of the corporate form even resolving all factual inferences in favor of appellants.

either express or implied. We will not set aside the judgment of the trial court in a non-jury case "except for errors of law, [or] unless it appears that the judgment is plainly wrong or without evidence to support it." *Robinson v. Jones*, 429 A.2d 1372, 1374 (D.C. 1981); D.C.Code § 17–305(a). The record adequately supports the trial court's determination on this issue.[29]

Finally, appellee, GMK, argues that even if there were no contract, express or implied, for services rendered post-June 1984, the trial court abused its discretion in refusing to let GMK amend the complaint to permit recovery based upon quantum meruit. The trial court refused to entertain this theory because of the ruling of the pretrial judge (Judge William Gardner). Initially, the pretrial judge had so ruled because GMK failed to plead the theory in its Third Amended Complaint and because GMK had relied consistently upon an express contract in seeking recovery.[30] GMK filed a motion to clarify, and the pretrial judge reaffirmed its ruling adding that "[w]here the plaintiff had not alleged a claim on the implied contract or quantum meruit in its complaint, it cannot do so by means of a pretrial statement or a pretrial order." We find no abuse of discretion in the pretrial judge's decision to deny

GMK leave to amend under the circumstances.[31] *See Gordon v. Raven Systems & Research, Inc.*, 462 A.2d 10, 13–14 (D.C. 1983).

## IV.

### Sanctions

Appellee/cross-appellant, GMK, argues that the motions judge (Judge Stephen Eilperin) erred in awarding as sanctions only $5,000 of the $12,629 it found that GMK incurred as attorney's fees attributable to Bingham's untimely response to discovery.[32] At the hearing on the motion for sanctions, Judge Eilperin found that although there was no bad faith on the part of Bingham and PFP in withholding the document, their conduct in failing to produce it timely was grossly negligent. The court ordered GMK to submit details of the costs it incurred because of the delay. GMK requested $26,054.25 in attorneys' fees and $787.48 in costs, which appellants opposed. In setting the award at $5,000, the court stated:

[GMK's] failure to timely produce the documents at issue was negligent, not willful, and the amount of time expended by [GMK] on this case given its limited promise has been plainly excessive, at least in

---

29. Mr. Goldberg testified that he did not know who requested GMK's services after June 30th, although he gave inconsistent testimony on the same point a day earlier. He was also unable to state the terms of any agreement allegedly entered after that date. There was a factual and legal basis for the trial court's determination that an oral contract, express or implied, had not been established. *See Rosenthal v. National Produce Co.*, 573 A.2d 365, 369–70 (D.C.1990). Even if there were circumstantial evidence tending to support GMK's theory, we will not retry the issues nor overturn the court's determination where the record supports it. *See Robinson, supra*, 429 A.2d at 1374.

30. The two remedies may be joined in the same action. *North American Graphite Corp. v. Allan*, 87 U.S.App.D.C. 154, 156, 184 F.2d 387, 389 (1950); *see also Giordano v. Interdonato*, 586 A.2d 714, 718–19 (D.C.1991). However, the assertion of one theory is not implicit in the other such that a party need only plead one to proceed on both as GMK contends. On the contrary, *"quantum meruit* [ ] is not applicable when compensation of the parties is covered by an express written contract." *Standley v. Egbert*, 267 A.2d

365, 368 (D.C.1970); *see also Finard & Co. v. Capitol 801 Corp.*, 749 F.Supp. 15, 18 (D.D.C. 1990), *aff'd in part*, 298 U.S.App.D.C. 140, 976 F.2d 1444 (1992); *Chancellor v. L.J. Hooker Commercial Real Estate, Inc.*, 690 F.Supp. 35, 39 (D.D.C.1988). In *North American Graphite*, both theories had been pled properly, and the court simply said that plaintiff could not be forced to choose between the two at trial. Here, GMK did not plead any alternative theory nor seek to do so until too late under the circumstances.

31. We also reject any claim that the trial court erred in adhering to the pretrial judge's ruling on this record. Further, we find no basis for GMK's argument that its quantum meruit theory was tried by express or implied consent of the parties, thereby providing a basis for a conforming amendment to its final amended complaint. *See* Super.Ct.Civ.R. 15(b).

32. The document involved was a copy of the certificate of incorporation of PFP, Inc. The document shows the existence of the corporation prior to the execution of the contract with GMK. In that regard, the document was helpful to appellants/cross-appellees.

terms of seeking reimbursement for the fees that work generated. An award of $5,000 seems reasonable under the circumstances.

The court denied appellee's motion for reconsideration and appellants' motion for clarification and stay pending appeal, expressly stating that the latter was "without merit" and "essentially frivolous." Appellee then moved for Rule 11 sanctions based on the court's denial of the motion for clarification, which the court denied without a hearing. GMK seeks a remand for an award of the entire $12,629 [33] and for the imposition of additional sanctions for what it contends was caused by appellees' efforts to avoid the initial sanction.[34]

 Sanctions for failure to make discovery are "particularly committed to the trial court's discretion." *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1261 (D.C.1979) (citations omitted). The court's decision imposing sanctions will not be disturbed absent an abuse of discretion. *Id.* at 1262. Appellee/cross-appellant argues that the court abused its discretion by improperly linking appellants' litigation conduct to the merits of the litigation. We do not read the court's order to mean that it reduced the fee it would have imposed otherwise because of the merits of the underlying claims. Rather, the court determined that in "seeking reimbursement for fees that [discovery] work generated[ ]," GMK expended excessive time. We find no abuse of discretion in the court's ruling in this regard.[35]

## V.

For the foregoing reasons, the judgment for GMK against Bingham is vacated, and the case is remanded with instructions that judgment be entered in favor of Bingham. Otherwise, the judgment and orders appealed from, directly or by cross-appeal, are affirmed.[36]

*Reversed in part and affirmed in part.*

---

**33.** The motions judge determined that the costs associated with appellants/cross-appellees' untimely production of the documents were related to (1) holding the pretrial conference, (2) legal research on promoter liability, (3) trial preparation for the first scheduled trial date, and (4) preparation of the fee petition.

**34.** In a reply brief, appellant seeks for the first time to challenge the award of $5,000 as a discovery sanction. It appears that appellant's reply brief was allowed to be withdrawn pursuant to order of this court. In any event, the reply brief is limited to responses to the issues presented by the adverse party's brief, and it is not appropriate to raise new issues on appeal. *See* D.C.App.R. 28(c); *see also Joyner v. Jonathan Woodner Co.*, 479 A.2d 308, 312 n. 5 (D.C.1984). This issue should have been raised in appellant's initial brief, and it is not properly included in the reply brief.

**35.** GMK also argues that the trial court erred in declining to impose sanctions based on its finding that appellant's motion for clarification was frivolous and in declining to award the full amount of the costs claimed by GMK for process server fees. Both matters are within the trial court's discretion. *See Stansel v. American Sec. Bank,* 547 A.2d 990, 995–96 (D.C.1988) (trial court has broad discretion to determine whether rule 11 has been violated), *cert. denied,* 490 U.S. 1021, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989); *see also Robinson v. Howard Univ.,* 455 A.2d 1363, 1369 (D.C.1983) (the award of costs is within the trial court's discretion). Our examination of the record reveals no abuse of discretion by the trial court in making either ruling.

**36.** *See supra* note 2.