Robert L. **LENNON**, Appellant,

v.

**UNITED STATES THEATRE CORPORATION, et al.**

No. 90–7020.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1990.

Decided Dec. 7, 1990.

Robert F. Condon, Washington, D.C., for appellant.

Maurice R. Dunie, Bethesda, with whom Anne M. Schiller, Washington, D.C., was on the brief, for appellees.

Before BUCKLEY, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Robert L. Lennon appeals a judgment holding him liable for breach of a commercial lease in the District of Columbia. We affirm in part but remand to the district court for a determination of whether Lennon's landlord, the United States Theatre Corporation, made reasonable efforts to mitigate its damages.

U.S. Theatre owns a commercial building located at 406 Seventh Street in Northwest Washington. On January 9, 1980 it leased the building to Lennon for a term later extended to January 31, 1991. Lennon and his subtenants used the building to house several art galleries.[1]

In November 1987 water began leaking from the roof into several of the galleries. The managers of the subleasing galleries complained to Lennon "vigorously." Memorandum Opinion 2. In early December Lennon notified U.S. Theatre and its property managers that the roof was in need of serious repair. Apparently under the impression that it had a duty to make such repairs, U.S. Theatre offered to replace the roof.

In fact U.S. Theatre did not complete the job until March 1988. While it attributes the delay to weather, logistical problems, and the search for an appropriate contractor, the court below hinted at another factor. It suggested that in order to win an unrelated dispute with Lennon about taxes and various rental charges, U.S. Theatre "played 'hard to get' and treated Lennon's exaggerated claims of water damage casually for a while, attempting to use the subtenants' complaints as leverage on Lennon to get [its] way." Memorandum Opinion 4. Nevertheless, the trial court expressly found that U.S. Theatre "proceeded reasonably once it decided to [restore the roof]." *Id.* at 6.

In February 1988 Lennon stopped paying rent and brought this diversity action against U.S. Theatre, alleging breach of warranty and contract, negligence, and tortious interference with Lennon's relationship with his subtenants. U.S. Theatre counterclaimed to recover unpaid rent and related charges. In addition, on October 26, 1988, U.S. Theatre wrote to Lennon, invoking its right under § 17 of the lease to terminate the lease for nonpayment of rent and to reenter the premises within five days, and stating its intent to claim damages under § 23 for lost rents for the rest of the term. U.S. Theatre also brought its own action for possession in D.C. Superior Court, and in March 1989, shortly after the Superior Court issued a protective order requiring Lennon to make certain rent payments into court, Lennon turned over the keys to U.S. Theatre's counsel.

On October 31, 1989 the district court issued a memorandum opinion rejecting all of the lessee's claims and awarding U.S. Theatre damages consisting of all unpaid rents and related charges due since March 31, 1988, less the security deposit and rents received since that date. On December 22 it entered a judgment that in addition found the lessor "entitled to a continuing

---

1. Lennon argues that he had assigned the lease to a partnership composed of him and his subtenants. We defer to the district court's explicit finding that "the lease was never assigned to anyone at any time. Lennon, individually, was the lessee and sole tenant at all times and re-mains the lessee today." Memorandum Opinion 2–3. We therefore affirm the district court's rejection of Lennon's claim that U.S. Theatre's counterclaims should have been dismissed because those counterclaims named him rather than the partnership as the defendant.

judgment for damages equal to the rent and lease charges which accrue under the lease after October 31, 1989, through January 31, 1991 (less rent received)."

*Lessor's right to damages for rental losses accrued after the notice to terminate*

■ Lennon contests the landlord's right to damages for lost rentals after the effective date of the five-day notice to quit, i.e., after approximately November 1, 1988. The argument is that §§ 17 and 23, although included in the lease to assure the landlord the equivalent of ordinary contract remedies for a tenant's failure to pay rent, so interact as to defeat the damage remedy.

The clauses in question are designed to supersede two common law principles. Under the first principle, a tenant's breach, no matter how drastic, does not entitle his landlord to terminate the leasehold or reenter the property. The landlord's remedy for non-payment of rent is to sue for it. See, e.g., *Brown's Administrator v. Bragg*, 22 Ind. 122, 123 (1864); 1 American Law of Property § 3.94 at 380 (A.J. Casner ed. 1952); 1 Restatement (Second) of Property, Landlord and Tenant § 13.1, Reporter's Note 1 at 502 (1977).

This doctrine denies a landlord any counterpart of the ordinary right of a contracting party to treat his own obligations as ended once the other party commits a "total" breach. For instance, one who has contracted to make successive deliveries of potatoes may stop tendering them once the buyer has completely reneged. See 4 Corbin on Contracts § 946 at 809–13 (1951); 6 Corbin on Contracts § 1253 at 7–16 (1962); 11 Williston on Contracts § 1292 at 8–11 (3rd ed. 1968). The peculiarity of landlord-tenant law evidently arises from courts' regarding the lease as *completing* the transfer of an estate in land, rather than as creating an obligation in the landlord to supply the premises for successive periods. Thus the court in *Brown's Administrator* analogized the case to a seller's attempt to reclaim a horse because the buyer had stopped making payments toward the pur-

chase price (the seller having retained no security interest).

The second common law principle targeted by the lease is that even if the lessor recovered the premises (by virtue of a statute, a special provision in the lease, or tenant abandonment), he would not only lose his claim to rent, which is understandable since he would no longer be allowing the tenant access to the property, but also would have no claim to damages for future rental income lost because of temporary vacancies or slumps in the rental market. See 1 Restatement § 12.1, Reporter's Note 7, at 423–24.

These common law rules are at best awkward. The landlord's right to rent is subject to the risk of the tenant's insolvency or disappearance. For his part, the tenant remains liable for the rent, with his ability to reduce the loss by bringing in a replacement tenant often subject to restrictions on sublease and assignment. Although the parties may negotiate their way out of the dilemma, there is some risk that they will fail to do so, resulting in wasteful non-use of the property and an increase in the losses the parties must bear.

District law appears uncertain on these issues. A statute, D.C.Code § 16–1501 (1981), provides the landlord an action to recover possession, but only if he has a right to possession, which under the common law he would lack. See also 1 Restatement § 12.1, Statutory Note 1 at 399, 404–05 (listing § 16–1501 among statutes allowing recovery of possession only where the lease provides for a forfeiture); but compare D.C.Code § 45–2551(b) (1981) (evidently affording residential landlords a right to possession). And while District cases speak of the landlord's having a right to relet and recover damages, see, e.g., *Satin v. Buckley*, 246 A.2d 778, 780–81 (D.C.App.1968); *McIntosh v. Gitomer*, 120 A.2d 205, 206 (D.C.1956), so far as we can determine in each case the lease provided such a remedy. Accordingly, the lease here included provisions aimed at assuring the landlord both the right to recover possession and a right to damages for rental losses thereafter. Section 23 provides a

damage remedy after the landlord's recovery of possession:

> In the event that the relation of the Landlord and Tenant may cease or terminate by reason of the re-entry of the Landlord under the terms and covenants contained in this lease or by the ejectment of the Tenant by summary proceedings or otherwise, or after the abandonment of the premises by the Tenant, it is hereby agreed that the Tenant shall remain liable and shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord, and the Tenant expressly agrees to pay as damages for the breach of the covenants herein contained, the difference between the rent reserved and the rent collected and received, if any, by the Landlord during the remainder of the unexpired term. . . .

Section 17 provides for recovery of possession:

> It is expressly understood and agreed that in case the demised premises shall be deserted or vacated, or if default be made in the payment of the rent or any part thereof as herein specified, . . . the Landlord may, if the Landlord so elects, at any time thereafter terminate this lease and the term hereof, on giving to the Tenant five days' notice in writing of the Landlord's intention so to do, and this lease and the term hereof *shall expire* and come to an end *on the date fixed in such notice* as if the said date were the date originally fixed in this lease for the expiration hereof. . . .

(Emphasis added.)

The tenant argues that § 17, especially the emphasized language, obliterates § 23: First, termination under § 17 ends the lease itself, including § 23; second, even if § 23 in principle survives, the "unexpired term" to which it refers necessarily ends when § 17's five-day notice takes effect. The tenant regards the relation between the two sections as a textual ambiguity, to be resolved against the lessor as presumed drafter of the lease. (In fact, the lease is a form, fresh from a legal stationer's, but in all probability it was selected by the les-

sor's lawyer, and along with the parties we assume that the lessor should be treated as drafter.)

As § 17 apparently applies to any circumstance under which the landlord may cause the leasehold to "cease or terminate" (the trigger event for § 23's remedies), the tenant's analysis would drain the latter provision of all meaning; where § 23 created remedies, its interaction with § 17 would destroy them. Indeed, the tenant so argued at oral argument. The tenant cites no District of Columbia decision applying the inference against the drafter in so draconian a fashion: destroying one of two arguably conflicting clauses when there are reasonable interpretations by which both may survive, harmoniously fulfilling the probable intent of the parties. Here the most reasonable interpretation of § 17 easily reconciles it to § 23.

Although § 17 speaks of terminating the "lease" itself, the natural reading is that it terminates the *leasehold*, countering the rule of *Brown's Administrator* and leaving in place the damage rights for which § 23 provides. The same reading—an end to the leasehold but not the contract—also disposes of the tenant's claim that the five-day notice of § 17 cuts short the unexpired term for which § 23 provides damages. Another way of wording the same outcome is to read § 17 as terminating the lease for all purposes other than damage remedies, which presuppose a breach and—under this lease—a likely end to duties to perform under the contract.

Indeed, the Restatement clearly assumes that the end of a lease need not spell the end of damage remedies that it provides, saying that a lease may obligate the tenant to make payments "equal to the rent . . . or in some other amount, when the lease is terminated prematurely." 1 Restatement § 12.1 comment g. In reality, the question of whether a contract "exists" after obligations to perform its covenants end, but a right to damages for breach survives, is highly metaphysical. But it is clear that a contract's provisions can define and provide remedies even after all obligations to perform under the contract have been dis-

charged. See 5A Corbin on Contracts § 1229 at 509 (1964) ("The exercise of a power to 'terminate' or 'cancel' the contract, by reason of a breach or other nonperformance by the other party, does not discharge ... [the injured party's] right to damages for a breach that has been committed previously."); see also 11 Williston §§ 1305, 1339. We find no contradiction between the clauses; § 23 provides a damage remedy.[2]

The parties quarrel over whether the termination of the lease came through "abandonment," "surrender," or some other way. The tenant cites *Ostrow v. Smulkin*, 249 A.2d 520, 521 (D.C.1969), for the proposition that when a landlord accepts a "voluntary surrender" by the tenant he foregoes the right to collect *rent*. This is correct under District law, but it does not eliminate an otherwise applicable right to *damages*, see *id.*, and the District reads covenants providing for tenant liability for lost rent after a landlord's re-entry as creating just that, a damage remedy, see *McIntosh v. Gitomer*, 120 A.2d 205, 206 (D.C.1956). Here the end of the leasehold under § 17 ended the rent obligation, replacing it with liability for damages under § 23.

### Mitigation

■ The district court's judgment would allow U.S. Theatre to collect from Lennon the total amount he would have owed in rent had he remained in possession through January 31, 1991, less the security deposit and the rentals U.S. Theatre will have actually received up to that date. Under District law, however, a lease provision giving the re-entering lessor a right to lost rent is construed as creating a right to damages, subject to the mitigation doctrine, i.e., to a requirement that the lessor use "reasonable efforts" to relet. See *Satin v. Buckley*, 246 A.2d 778, 781 (D.C. 1968); *McIntosh v. Gitomer*, 120 A.2d 205,

206 (D.C.1956).[3] Functionally, of course, this means that the damages will be computed as the rentals provided for in the lease (plus reletting expenses), less such rentals as the lessor would have received if it had made reasonable efforts. See 5 Corbin on Contracts § 1039 at 242–43 (1964). The district court, however, did not address the reasonableness of U.S. Theatre's efforts to relet. We remand the case for further consideration of the issue.

We note that failure to mitigate is an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure and must be pleaded. See *Sayre v. Musicland Group, Inc.*, 850 F.2d 350, 352–55 (8th Cir. 1988) (citing cases). Lennon appears not to have pleaded it, possibly because he never, so far as appears, filed any reply to the amended counterclaim by which U.S. Theatre added its claim to lost future rent. As U.S. Theatre has not raised the issue, however, it has in all likelihood waived any waiver defense that Lennon's omission might otherwise have created. See *McKnight v. General Motors Corp.*, 908 F.2d 104, 108 (7th Cir.1990).

### Damages arising from the leaky roof

■ Lennon seeks damages for U.S. Theatre's "negligent" delay in pursuing its "duty" to fix the leaky roof. We reject the claim for several reasons: (1) U.S. Theatre had no duty to fix the roof, (2) it acted reasonably once it decided to fix it, and (3) Lennon has not proven that he suffered damages as a result of the delay.

In the District of Columbia a landlord has no duty to make repairs to commercial properties beyond what he undertakes in the lease. In *Interstate Restaurants, Inc. v. Halsa Corp.*, 309 A.2d 108 (D.C.1973), the District explicitly declined to extend to commercial leases any equivalent of the "implied warranty" to keep properties up

---

**2.** Lennon makes no claim either that § 23 is otherwise incapable of giving the lessor benefits equivalent to those afforded by the doctrine of total breach by anticipatory repudiation, see 4 Corbin § 959 at 852–56; *id.* § 975 at 916–19; 11 Williston § 1292, or that the doctrine of *Hermitage Co. v. Levine*, 248 N.Y. 333, 162 N.E. 97 (1928), denying a landlord damages for lost

rental until the expiration of the original term of the lease, bars the district court's order.

**3.** The District cases do not address the validity of a clause explicitly negating any duty to mitigate, and on the present facts we need not do so either.

to code that this court had found for residential leases in *Javins v. First National Realty Corp.*, 428 F.2d 1071, 1076–77 (D.C. Cir.1970). See also *E.P. Hinkel & Co. v. The Manhattan Co.*, 506 F.2d 201, 206 (D.C.Cir.1974).

Lennon argues that several clauses in the lease require the landlord to make exterior repairs. For instance, he suggests that § 2, which confers on the tenant a duty to repair "the interior of the premises," implies by omission that the landlord must repair everything else. The flaw is Lennon's unfounded assumption that every possible repair *need* must be matched by a repair *duty* in one party or the other. Parties are free to leave issues of repair to be handled as they arise, and the variety of possible circumstances suggests that such an approach will often be sensible. For example, the lessor's incentive to repair will be strong where the unexpired term of the lease is short and the tenant could not possibly have caused the damage, but much weaker where the unexpired term is long and the lessee may have been responsible. Nothing in § 2 imposes a repair duty on the lessor.

Lennon also points to § 6, which permits the landlord to make certain repairs, and § 26, which absolves it of liability or rent reduction for inconvenience to the tenant that might result. But clauses assuring a right and opportunity to make repairs do not create a duty to make them. *Walker & Dunlop, Inc. v. Gladden*, 47 A.2d 510, 512 (D.C.1946). The claim that U.S. Theatre's frequent past repairs established a binding course of conduct is also flawed. Any such rule would have perverse effects, for "then all landlords would hesitate to make any repairs for fear that by so doing they would obligate themselves to make all repairs." *Id.*

■ Lennon also argues that U.S. Theatre specifically promised to fix the roof on several occasions. Yet even if we characterize U.S. Theatre's statements and ac-

tions as a "promise," it would not be binding under District law in the absence of new consideration. *Karl W. Corby Co. v. Zimmer*, 99 A.2d 485, 487 (D.C.1953). Lennon vaguely alludes to a theory of detrimental reliance, but in fact he does not specify how any of his acts or omissions were dependent on the supposed promise.

■ Of course, a landlord who "undertakes to repair [must] make the repairs properly and ... is liable for any neglect in making them." *Walker & Dunlop v. Gladden*, 47 A.2d at 511. But even if we assumed that the landlord's remarks here, coupled with the initiation of repair efforts, amounted to an undertaking within the meaning of that doctrine, Lennon failed to establish either that U.S. Theatre's delay amounted to negligence or that he, Lennon, suffered tangible harm as a result. The district court found explicitly that U.S. Theatre "proceeded reasonably" in restoring the roof "once it decided to do so," and that "Lennon completely failed to establish damages because of U.S. Theatre's delay." Memorandum Opinion 6.[4] Lennon has not persuaded us that either of these factual findings was clearly erroneous.

### Remaining issues

There remain two outstanding issues, neither of which calls for much discussion. First, Lennon contends that the district court erred in denying him a jury trial. But as the court noted, Lennon failed to oppose U.S. Theatre's motion to strike his demand for a jury trial. Besides, the lease contains a provision (§ 23) that explicitly waives the parties' right to a jury trial in any suit. Lennon tries to concoct an "ambiguity" here too, by pointing to what is arguably a portion of the lease form (perhaps a cover), unsigned but with a space for signature, that waives the tenant's right to a jury trial in cases where the landlord has initiated the suit. Lennon suggests that this writing implies, by omis-

---

**4.** Lennon suggests that the district court abused its discretion in excluding two witnesses who would have testified about the damage the leaks caused to Lennon's "leasehold interest." The court excluded these witnesses because Lennon failed to file a Rule 26(b) statement identifying these witnesses in advance, as required by a pretrial order. We are not convinced that the district court abused its considerable discretion in applying this sanction.

sion, that the tenant necessarily retains that right in cases (like this) where the tenant sued. If this writing has any legal effect, we cannot see why it should persuade us to nullify a provision giving the landlord a whole loaf (no jury no matter who sues), merely because otherwise the half-loaf clause will be redundant. Chopping out the broader clause seems an odd response to an overlap.

Lennon also alleges that U.S. Theatre tortiously interfered with the relationship between him and his subtenants. The district court rejected this claim, noting, first, that the evidentiary predicate was "feeble" and, second, that Lennon "was not damaged" by any arguable wrong-doing. Memorandum Opinion 6. We are not persuaded that these conclusions are clearly erroneous.

### Conclusion

We affirm the district court on all issues except that of damage mitigation, and remand the case for further proceedings.

*So ordered.*