Christopher A. HART, et al., Appellants/Cross–Appellees,

v.

VERMONT INVESTMENT LIMITED PARTNERSHIP, Appellee/Cross–Appellant.

VERMONT INVESTMENT LIMITED PARTNERSHIP, Appellant/Cross–Appellee,

v.

Christopher A. HART, et al., Appellees/Cross–Appellants.

Nos. 94–CV–426, 94–CV–457.

District of Columbia Court of Appeals.

Argued Sept. 11, 1995.
Decided Nov. 9, 1995.

---

Christopher A. Hart, pro se, with whom Raoul L. Carroll and Clayborne E. Chavers, Washington, DC, were on the brief, for appellants/cross-appellees Christopher A. Hart, et al.

Jeffrey M. Hamberger, Washington, DC, for appellee/cross-appellant Vermont Investment Limited Partnership.

Before SCHWELB and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

These appeals arise from a dispute between Vermont Investment Limited Partnership ("New Landlord") and Christopher A. Hart, Esquire, Raoul L. Carroll, Esquire, and Clayborne E. Chavers, Esquire (collectively "Tenant") over the validity and construction of a commercial lease. Following a bench trial, the Superior Court held that there had been no meeting of the minds when the lease was negotiated, and that the lease was therefore unenforceable. The judge concluded that, in the absence of a valid lease, the tenancy was at sufferance, and he limited accordingly the relief available to New Landlord for Tenant's breach.

We conclude that the lease was valid, unambiguous, and enforceable in conformity with its terms. Accordingly, we reverse the judgment and remand the case for further proceedings.

## I.

### THE EVIDENCE

On November 1, 1985, the law firm of Hart, Carroll and Chavers entered into a five-year lease agreement with 1025 Vermont Avenue Limited Partnership ("Prior Landlord") for commercial space which was to be used as a law office for the partnership. Section 1.01 of the Lease provided in pertinent part that "[t]he Leased Premises consist of 4,060 square feet." Section 2.01 of the lease stated, however, that "[i]n the event that the square footage of the Leased Premises determined pursuant to Section 1.01 hereof is different [from] the square footage provided for in said Section 1.01, the Minimum Rent shall be adjusted accordingly." The base rent agreed upon was $18.25 per square foot, but the lease stated that "[p]rovided Tenant is not in default hereof, Tenant shall be relieved of its obligation to pay one half ... of each monthly installment of Mini-

mum Rent during the first fourteen ... months of the term hereof."

On August 18, 1986, Prior Landlord notified Tenant that the leased premises consisted of 4625 square feet, an increase of approximately 14% over the 4060 square feet described in the lease. A few days later, Prior Landlord submitted a proposed amendment to the lease which would have required Tenant to pay for the additional 565 square feet. Tenant, however, declined to agree to the proposed new terms. On October 16, 1986, Prior Landlord submitted a document entitled "Lessee Estoppel" which indicated that Tenant occupied 4625 square feet and that the annual rent was $84,406. Tenant executed the Lessee Estoppel, but amended the amounts to reflect that it occupied only 4060 square feet and that the annual rent was only $74,095.

On December 2, 1986, with the impasse between the original parties to the lease remaining unresolved, Prior Landlord sold the building to New Landlord. On January 12, 1987, through its General Counsel, New Landlord notified Tenant by letter that "[w]e have examined your lease file and floor plan and have discovered [that] you are actually occupying 4883 square feet, rather than the 4060 square feet as set forth in your lease." New Landlord demanded that Tenant immediately transmit the rent for December 1986 and January 1987 in an amount based on the new measurements.

In the meantime, the Hart law firm had lost several of its law partners. As a result, Tenant became unable to comply with its rental obligations even at the rate originally agreed upon. At a meeting with New Landlord in January 1987, Tenant explained its financial condition and requested a reduction of the rental space and an opportunity to locate a subtenant. In a follow-up letter dated January 23, 1987, Tenant indicated that if its proposals were rejected, Tenant would vacate the premises on February 28, 1987. Tenant explained that it could no longer pay rent in excess of approximately $2000 per month. New Landlord responded that it would accept nothing less than the full rent, based upon 4883 square feet of office space.

By letter dated March 3, 1987, Tenant notified New Landlord that it had vacated the premises as of February 28, 1987. Tenant retained the keys, however, apparently in order to show the premises to prospective new tenants. On March 17, 1987, New Landlord's attorney advised Tenant that it had violated the lease by failing to pay rent and by abandoning the premises. New Landlord notified Tenant that it had five days to cure the violations, and warned that "[u]pon your failure to do so, the landlord will, without further notice, terminate the lease and institute an action for possession." On March 23, 1987, Tenant delivered the keys by hand to New Landlord, but Tenant did not pay rent for the month of March 1987 or for any month thereafter. In July 1987, the premises were rented to a new tenant.

## II.

## THE TRIAL COURT PROCEEDINGS

On February 27, 1990, New Landlord filed a complaint in the Superior Court, alleging that Hart, Carroll and Chavers had failed to pay rent and other charges due and had vacated the premises in violation of the lease. New Landlord prayed for damages in the amount of $328,119.98 (that sum apparently representing rent due and late charges alleged to be due). Each defendant filed a separate answer denying liability and counterclaimed for return of the security deposit.

The case was tried to the court, sitting without a jury, on October 28, 1992. On March 10, 1994, the trial judge issued his written Findings of Fact, Conclusions of Law, and Order. After setting out the facts in some detail, the judge concluded that there had been no meeting of the minds on material terms in the lease, and that the lease was therefore unenforceable. He reached this conclusion because, in his view, "[t]he square footage provision regarding office space is materially at variance with the understanding of the parties." Recognizing that Section 2.01 of the lease "provides for adjustments to the lease agreement in the event of a discrepancy," the judge was of the opinion that this provision "contemplates

only *de minimis* adjustments." The judge stated that

> the 20.3% increase in minimum rent[al] fails to be that intended by the parties and expresses a different agreement altogether. Therefore, the Defendants are not liable for the 20.3% increase in rent due to the failure of a meeting of the minds between the parties on that issue.

Because, in his view, the lease was not enforceable, the judge concluded that the defendants were "tenants at sufferance." The judge held that the defendants had given the requisite thirty-day notice to quit on March 3, 1987, and were thus liable for rent only through April 3, 1987. The judge awarded New Landlord $6,000 in "unpaid rent" and, curiously, $6,000 in late fees.[1] The judge did not address the defendants' counterclaims. Tenant's appeal and New Landlord's cross-appeal followed.

### III.

### LEGAL DISCUSSION

*A. Validity of the Lease.*

■■■ The lease negotiated by Prior Landlord and Tenant was a contract. *See, e.g., Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 941 (D.C.1980). Accordingly, the issues before us are governed by the substantive rules of contract law. *Id.* Here, the judgment of the trial court rests primarily on the judge's determination that there was no enforceable contract because there had not been a meeting of the minds. In reviewing that determination, we must sustain the judge's evidentiary findings unless they are clearly erroneous, *see* Super.Ct.Civ.R. 52(a), but we review his legal conclusions *de novo. American Bldg. Maintenance. Co. v. L'Enfant Plaza Properties, Inc.,* 655 A.2d 858, 861 (D.C.1995). In this

case, the question whether the lease is enforceable turns largely on the legal conclusions to be drawn from undisputed facts.

The trial judge apparently believed that the lease was invalid because the parties to it, or at least Tenant, subjectively intended Section 2.01 of the lease to apply only to *de minimis* adjustments of the square footage on which the rent was to be based.[2] The judge cited no authority in support of this position, and we know of none.

■■■ "It is, of course, the general rule that one who signs a contract has a duty to read it and [that he] is obligated according to its terms." *Hollywood Credit Clothing Co. v. Gibson,* 188 A.2d 348, 349 & n. 1 (D.C.1963) (citing 17 C.J.S. *Contracts* § 137 (1963)). In the absence of fraud or its equivalent, "one is obligated by his contract, though signed without knowledge of its terms." *Saylor v. Handley Motor Co.,* 169 A.2d 683, 685 (D.C. 1961). "It is not enough to avoid a contract that one party signed it believing it did not contain what was plainly expressed therein." *Spain v. Fuston,* 242 S.W.2d 892, 894 (Tex. Civ.App.1951). In *Howard Univ. v. Best,* 484 A.2d 958 (D.C.1984), we stated that

> [t]his court adheres to the "objective law" of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake.

(Citations and internal quotation marks omitted).

■■■ "The only intent of the parties to a contract which is essential, is an intent to say the words and do the acts which constitute

---

**1.** The judge's opinion does not disclose how the judge concluded that the unpaid rent amounted to $6,000. Both parties acknowledge, and we agree, that if there was no valid lease, there was no basis for the award of any late fees, and especially for late fees in an amount which was 100% of the rent found to be due.

**2.** Although the judge referred in this context to the parties in the plural, there is nothing in the

record before us to suggest that either Prior Landlord or New Landlord shared any such understanding, which is contrary to the unconditional language of § 2.01. Moreover, if there was no meeting of the minds, as the judge found, then Prior Landlord and Tenant necessarily must have disagreed as to the meaning of the disputed provision.

their manifestation of assent." *Ray v. William G. Eurice & Bros.*, 201 Md. 115, 93 A.2d 272, 278 (1952) (quoting Samuel Williston, WILLISTON ON CONTRACTS § 21 (Rev.Ed.)). Eighty-four years ago, in *Hotchkiss v. National City Bank*, 200 F. 287 (S.D.N.Y.1911), *aff'd sub nom. Ernst v. Mechanics' & Metals' Nat'l Bank of City of N.Y.*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913), Judge Learned Hand, then a United States District Judge, articulated the applicable principles in his own special way:

> A contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

*Id.* at 293; *accord Ray, supra,* 93 A.2d at 278 (quoting *Hotchkiss* ). A party's "claimed intent is immaterial, where it has agreed in writing to a clearly expressed and unambiguous intent to the contrary." *Ray, supra,* 93 A.2d at 278.

■ To paraphrase the Court of Appeals of Maryland, "[i]t does not lie in the mouth of [Tenant] to say that it intended to [agree to § 2.01 of the lease only if it meant *de minimis* ]." *Ray, supra,* 93 A.2d at 278. In the present case, the minds of the contracting parties met sufficiently when, after extensive negotiations, they agreed to the terms of the lease as written. No other meeting of the minds was required.

The present case may usefully be compared with *Groner v. Townhouse Realty, Inc.,* 235 A.2d 324 (D.C.1967). In *Groner,* the tenant agreed to lease the second floor of the landlord's commercial building for $45 per month. During the term of the lease, the tenant began to use the first floor as well. The landlord advised the tenant that, because the tenant was occupying two floors, the monthly rent would be doubled to $90. The tenant did not respond to this proposal, but nevertheless continued to use the first floor. The trial judge held that the tenant had agreed to the increase in rent by failing to object to it. This court, however, reversed, because

> [w]here there has been no meeting of the minds there is no contract. If a landlord insists on one rate of rental and the tenant insists on another, there is no meeting of the minds.

*Id.* at 325 (quoting *Welk v. Bidwell,* 136 Conn. 603, 73 A.2d 295, 297 (1950)).

In *Groner,* the landlord and tenant had never agreed on the rent to be paid for the first floor. In this case, on the other hand, the parties signed a lease which specified the rent for the entire space and they agreed to a provision for adjusting the rent if the square footage of the premises was miscalculated. The meeting of the minds, which was lacking in *Groner,* was supplied here by the negotiating parties' signatures on the lease.

In the present case, the lease specifically provided for the possibility that one or both of the parties to it might be mistaken as to the square footage of the leased premises. Under these circumstances, a court is obliged to enforce the contractual resolution of the problem raised by any such misapprehension, rather than to invalidate the contract itself.[3]

### B. Repudiation.

Tenant contends that, even if the lease was valid and enforceable at the time it was negotiated, it was rendered void by New Landlord's subsequent conduct. The trial judge did not rule on this contention. We conclude that New Landlord did not repudiate the agreement.

---

**3.** Because we are satisfied that the lease was valid from its inception, we need not address New Landlord's alternative theories (1) that Tenant's signature on the "Lessee Estoppel" now estops Tenant from challenging the validity of the lease, or (2) that by remaining on the premises during the first fourteen months of the lease term, when it was obliged to pay only half of the Minimum Rent, and by thus enjoying the benefits of its contract, Tenant should not thereafter be heard to argue that the contract was invalid.

■ Tenant argues that both Prior Landlord and New Landlord rendered the lease inoperative by seeking to enforce it contrary to its terms. Specifically, Tenant asserts that the landlords' attempts to obtain more than *de minimis* adjustments of the rent pursuant to § 2.01, based upon their new measurements of the square footage, constituted a material anticipatory breach. This contention is predicated on Tenant's belief that § 2.01 did not authorize the landlords' demands. Because we hold that Prior Landlord and New Landlord were within their rights in invoking § 2.01, their conduct was not a repudiation of the contract and did not relieve Tenant of its obligations under it.[4] Moreover, even if the demand made by New Landlord were found to be excessive, the appropriate remedy would have been to hold Tenant liable only for the rent to which New Landlord was properly entitled, rather than to invalidate the lease.

### C. "De Minimis".

Having concluded that the lease was valid and binding, we must determine whether a *de minimis* qualification should be read into the disputed provision of § 2.01. According to the trial judge, "the 20.3% increase in minimum rent fails to be that intended by the parties." We discern nothing on the face of the lease, however, to support the judge's reading of it. Further, we know of no legal authority permitting the court to rewrite the contract by inserting a limitation which does not appear therein.

■ "The question whether a writing is ambiguous is one of law." *American Bldg. Maintenance, supra,* 655 A.2d at 861. Assuming that the trial judge's decision is properly read as holding that § 2.01 is ambiguous, "an appellate court owes no deference to the trial court's resolution of that question, but considers the issue *de novo.*" *Id.; see also Sacks v. Rothberg,* 569 A.2d 150, 154 (D.C.1990). It is true that New Landlord and Tenant are at odds as to the meaning of § 2.01, but "[a] contract is not ambiguous merely because the parties do not agree on the proper interpretation of [its] provision[s]." *Sacks, supra,* 569 A.2d at 154–55; *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988).

■ A lease or a clause therein is ambiguous if it is susceptible of more than one reasonable interpretation. *American Bldg. Maintenance, supra,* 655 A.2d at 861. "Ambiguity exists only if the court determines that [the] proper interpretation of the contract depends upon evidence outside the contract itself." *Dodek, supra,* 537 A.2d at 1093. The question whether a particular writing is fairly susceptible of more than one reasonable interpretation is resolved on the basis of the "face of the language itself, giving that language its plain meaning, without reference to any rules of construction." *Sacks, supra,* 569 A.2d at 154 (quoting *Kass v. William Norwitz Co.,* 509 F.Supp. 618, 625 (D.D.C.1980)). In the absence of any ambiguity in its language, "a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Dodek, supra,* 537 A.2d at 1092 (quoting *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983)).

■ Section 2.01 of the lease, as we have seen, provides that

[i]n the event that the square footage of the Leased Premises determined pursuant to Section 1.01 hereof[5] is different [from]

4. The authorities relied upon by Tenant in this regard do not support its position. In the lead case cited in Tenant's brief, for example, the court stated that, under Minnesota law,

[i]f a party to a contract demands of the other party a performance to which he has no right under the contract *and states definitely that, unless his demand is complied with, he will not render his promised performance,* an anticipatory repudiation has been committed. 4 Corbin, Contracts § 973 (1951).

*Unique Systems, Inc. v. Zotos Int'l, Inc.,* 622 F.2d 373, 377 (8th Cir.1980) (emphasis added). Nothing comparable to the italicized language occurred in this case.

5. The provision of § 1.01 to which § 2.01 refers reads as follows:

The exact square footage in the Leased Premises shall be determined by the Landlord's architect after the construction of the building in which the Leased Premises are located is completed which square footage shall be used in all calculations based on square footage throughout this Lease.

the square footage provided for in said Section 1.01, the Minimum Rent shall be adjusted accordingly.

There is nothing in the quoted sentence to suggest that only *de minimis* variations were contemplated. On their face, the words "different [from]" in § 2.01, as written, embrace large differences, small differences, and differences of medium size.[6]

The terms of this lease were agreed upon following extensive negotiations. Mr. Hart and his colleagues had ample opportunity to request modifications in the language which Prior Landlord proposed to them, and the record reflects that they availed themselves of that opportunity. On August 16, 1985, Mr. Hart sent a letter to Prior Landlord's representative in which he suggested no fewer than twenty-three separate changes to the draft which had been presented to him. In fact, Mr. Hart even requested a revision in one part of § 2.01, but he made no mention in his letter of the provision as to square footage which is at issue in this case.

Section 2.01 applies both to upward adjustments and to downward adjustments of square footage. If the space had turned out to be less than 4060 square feet, Tenant would have been entitled to a reduction in the rent. Having failed to seek a modification of § 2.01, Tenant cannot now reasonably expect the court to rewrite the lease in Tenant's favor, or to impose by judicial *fiat* a provision which the parties did not include therein. *See, e.g., Providence Hosp. v. Group Hospitalization, Inc.*, 494 A.2d 639, 640 (D.C.1985).[7]

We have recognized that "[t]he reasonable person is ... bound by all usages—habitual and customary practices—which either party knows or has reason to know." *Best*, 484 A.2d at 967. Tenant claims to rely on customary business usage for its interpretation of § 2.01. So far as the appellate record reveals, however, Tenant adduced no evidence as to the relevant practices in the commercial real estate business. We do not doubt that "[w]here a fact is well-known by all reasonably intelligent people in the community, or its existence is so easily determinable with certainty from unimpeachable sources, it would not be good sense to require formal proof." *Poulnot v. District of Columbia*, 608 A.2d 134, 141 (D.C.1992) (quoting *Harper v. Killion*, 345 S.W.2d 309, 311 (Tex.Civ.App.), *aff'd*, 162 Tex. 481, 348 S.W.2d 521 (1961)). The proposition that language such as that in § 2.01 is required by trade usage to be applied only to *de minimis* variations, however, is neither "well-known by all reasonably intelligent people in the community" nor "easily determinable with certainty from unimpeachable sources." In the absence of competent proof of the claimed custom or usage, Tenant can obtain no solace from the doctrine of judicial notice.

The trial judge found that Mr. Hart and his colleagues "regarded the price of the office space as a major budgetary consideration," and that they "price-shopped" extensively before selecting the premises in question and signing the lease. The apparently unanticipated invocation by both Prior Landlord and New Landlord of the square footage provision in § 2.01 may well have created

Although the judge's findings are devoid of any reference to a post-construction determination by the Prior Landlord's architect, no contention has been made to us (or, so far as we can discern, to the trial court) that § 2.01 does not apply to this dispute. Neither party has included in the record a transcript of the trial court proceedings. *Cf. Parker v. Stein*, 557 A.2d 1319, 1323 (D.C. 1989) (discussing respective responsibilities of appellant and appellee); *Cobb v. Standard Drug Co.*, 453 A.2d 110, 111 (D.C.1982).

**6.** *Cf. Hagenbuch v. Chapin*, 149 Ill.App.3d 572, 102 Ill.Dec. 886, 500 N.E.2d 987 (1986). In *Hagenbuch*, the seller advertised for auction "Choice farmland ... consisting of 129 acres—

more or less." The court stated that the phrase "more or less" is "language of precaution used in deeds to cover slight and unimportant inaccuracies such as those incident to measurement by different surveyors and variations in the instructions used." *Id.*, 102 Ill.Dec. at 889, 500 N.E.2d at 990 (citing *Koch v. Bird*, 174 Mich. 594, 140 N.W. 919 (1913)). The present case would present a different problem if the parties had used a phrase like "more or less" rather than the unrestricted language of § 2.01.

**7.** Tenant also could have measured the square footage of the premises before signing the lease, but failed to do so.

potential hardship for Tenant.[8] The language of the lease being plain and unambiguous, however, a court may not rewrite it in order to relieve one of the parties from a bargain that did not turn out to that party's advantage.

## D. Unconscionability.

Tenant contends that § 2.01, if read literally, leads to an absurd result. Reasonable people, according to Tenant, "could not possibly have intended for a lease to obligate a tenant to, say, a 200% increase in rent because of a 200% error in space measurement."

Tenant's hypothetical is a somewhat improbable one. In most instances, a reasonably prudent person would not believe that he or she was renting 300 square feet when the premises in question actually covered an area of 900 square feet. Such a miscalculation, in most instances, would be obvious to any reasonable person. But even if we assume that a 200% increase in rent should not be permitted, it does not follow that a *de minimis* condition should be judicially inscribed into § 2.01.

Although Tenant has not framed its argument in terms of unconscionability, it has at least indirectly invoked that doctrine. Even when construing a contract containing a provision like § 2.01, a court might reasonably decline to allow a landlord to raise the monthly rent from, say, $3000 to $9000. So large an increase might well be deemed unconscionable, especially if sought to be enforced by the party with the superior bargaining position. But even assuming that, in the absence of an allegation of fraud, a sophisticated tenant who had engaged in extensive negotiations with a landlord could thereafter successfully invoke the doctrine of unconscionability—a dubious proposition at best, *see, e.g., Williams v. Walker–Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 319, 350 F.2d 445, 449 (1965)[9]—we conclude, for the reasons stated below, that the lease should not have been invalidated.

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams, supra,* 121 U.S.App.D.C. at 319, 350 F.2d at 449 (citations omitted). In this case, given the sophistication of the negotiating parties, and the arm's length bargaining which occurred, we cannot say Tenant was denied a meaningful choice, or that a 20.3% increase in rent is sufficiently extreme to render it unenforceable for unconscionability. The lease, at least on these facts, is enforceable according to its terms.

Moreover, even if a 20.3% increase were deemed unconscionable, the contract should not be voided. In *Scott v. United States,* 79 U.S. (12 Wall.) 443, 445, 20 L.Ed. 438 (1870), the Supreme Court explained that

[if] a contract be unreasonable and unconscionable, but not void for fraud, a court of law will give to the party who sues for its breach damages, not according to its letter, but only such as he is equitably entitled to.

*See also Williams, supra,* 121 U.S.App.D.C. at 318, 350 F.2d at 448 (quoting *Scott*). In other words, if the relief sought by a plaintiff according to the literal terms of an agreement is unconscionable, then the court should deny the unwarranted relief, but should award the plaintiff whatever amount is not unconscionable. Thus, even if a 20.3% increase in the rent were excessive to the point of unconscionability—which, on these facts, it is not—then the court should deny an increase in that amount, but should authorize a reasonable lesser adjustment.

## E. Damages.

Because we have held that the lease in this case constitutes a valid and enforceable contract, New Landlord is entitled to damages as specified in that instrument, subject to applicable legal principles. Because the trial judge held the lease to be invalid, he issued no findings of fact or conclusions of law

---

8. We note, however, that the resignations of several partners in the law firm impaired Tenant's ability to pay even the lower rent based on the square footage as initially determined.

9. Obviously, this case does not involve the kind of negotiation between an industrial giant and an impoverished widow or orphan which is viewed as the paradigm for claims of unconscionability.

regarding damages under the lease, and the parties have not fully briefed this issue.

In its complaint, as we have noted, New Landlord demanded $328,119.98, together with a counsel fee of $5,000. In its post-trial brief, New Landlord contended that, if the court credited the testimony that the Tenant was occupying 4883 square feet, New Landlord was entitled to recover $278,967.17.[10] Tenant, on the other hand, maintains that New Landlord terminated the lease in March, 1987 by, *inter alia*, demanding that Tenant return the keys to "unconditionally surrender the premises." Tenant contends that its liability for rent terminated, at the latest, on March 17, 1987, when it returned the keys to New Landlord. Tenant also maintains that it is entitled to return of the security deposit and to interest thereon.

 District of Columbia law provides a landlord with three options in the event of a wrongful abandonment. *International Comm'n on English in the Liturgy v. Schwartz*, 573 A.2d 1303, 1306 (D.C.1990). First, he may accept the abandonment and thereby terminate the lease. If the landlord does so, the obligation of the tenant to pay future rent ceases, but the tenant is still liable for any damages specified in the contract as a remedy for its breach.[11] *Truitt v. Evangel Temple, Inc.*, 486 A.2d 1169, 1173 (D.C.1984); *Ostrow v. Smulkin*, 249 A.2d 520, 521 (D.C.1969); *McIntosh v. Gitomer*, 120 A.2d 205, 206 (D.C.1956); *see also Lennon v. United States Theatre Corp.*, 287 U.S.App.D.C. 202, 206, 920 F.2d 996, 1000 (1990). Second, the landlord may relet the premises and hold the tenant liable for any deficiency in the rent, without acquiescing in the abandonment. However, "[u]nder Dis-

trict law, ... a lease provision giving the re-entering lessor a right to lost rent is construed as creating a right to damages, subject to the mitigation doctrine." *Lennon, supra*, 287 U.S.App.D.C. at 206, 920 F.2d at 1000 (citing *Satin v. Buckley*, 246 A.2d 778, 781 (D.C.1968)). The landlord's third option is to allow the premises to remain vacant and to hold the tenant for the full rent, *Truitt, supra*, 486 A.2d at 1172, but New Landlord did not elect to take this course in the present case.

On remand, the trial judge is directed to determine New Landlord's damages in light of these authorities and the provisions of the lease. We specifically note that because the quantum of damages is governed by the lease, the judge must make a finding as to the correct square footage. It is undisputed that New Landlord had the obligation to mitigate its damages, and the trial judge must determine whether New Landlord made reasonable efforts to do so. *Lennon, supra*, 287 U.S.App.D.C. at 206, 920 F.2d at 1000. Finally, the trial judge is directed to rule explicitly on the defendants' counterclaims relating to the security deposit.

## IV.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

10. New Landlord's calculation was as follows:

| Base rent for entire term of lease | $423,652.25 |
|---|---|
| Operating Expenses | 70,555.29 |
| GROSS AMOUNT DUE | 494,207.54 |
| Less: | |
| Amounts paid by Tenant | −56,707.10 |
| NET DUE AFTER RENT PAYMENTS | 437,500.44 |
| Plus: | |
| Late Charges at 4% | 17,500.02 |
| Attorney's fees | 5,000.00 |
| Less: | |
| New Landlord's mitigation of damages | −181,033.29 |
| TOTAL DAMAGES | $278,967.17 |

Based on the original figure of 4060 square feet, New Landlord claimed that it was entitled to damages in the amount of $188,386.64.

11. In the present case, the lease provides that in the event of a breach by the tenant, the landlord is entitled to recover rent for the remaining term of the lease, as well as late charges, reletting expenses, certain other expenses, and counsel fees, minus the net proceeds from the reletting of the premises.