**DOUBLE H HOUSING CORPORATION,**
Appellant,

v.

**BIG WASH, INC., Appellee.**

No. 98–CV–1312.

District of Columbia Court of Appeals.

Argued May 16, 2000.

Decided May 30, 2002.

As Amended July 10, 2002.

Roger D. Luchs, Washington, DC, with whom Ana I. Fábregas was on the brief, for appellant.

Kathleen F. O'Reilly for appellee.

Before WAGNER, Chief Judge, and TERRY and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

This appeal involves two sections of a commercial lease. We must determine which of the two provisions governs the manner by which the tenant, Big Wash, Inc., should be billed for the consumption of water used in its laundromat business. The landlord, Double H Housing Corpora-

tion, argues that the term "water rents," as included in section 4.2 of the lease ("Taxes and Assessments"), is ambiguous and thus must be read in conjunction with section 15.1 ("Services and Utilities"). When these two sections are read together, Double H argues, section 15.1 obligates Big Wash to pay for its actual water consumption in addition to the proportionate share of taxes and assessments specified in section 4.2. Big Wash contends, to the contrary, that billing for water consumption is specifically included in the lease as "water rents" under section 4.2 and thus may be billed only in accordance with that section. Following a non-jury trial, the trial court ruled in favor of Big Wash. Concluding that the term "water rents" as used in section 4.2 is not ambiguous, we affirm.

I

On June 7, 1995, Double H and Big Wash entered into a ten-year lease for two storefront spaces in a shopping center in the District of Columbia. The basic monthly rent was $2,033.33 for the first year, with gradual increases to follow over the term of the lease. In addition to the basic rent, three sections of the lease outlined additional expenses to be paid by Big Wash. Section 4.1 provided that Big Wash would pay a proportionate share (9.2 percent) of certain taxes and assessments and common area maintenance ("CAM") costs. The lease defined CAM costs to include all costs incurred by the landlord in servicing, operating, repairing, and maintaining the common areas.

Under section 4.2, Big Wash also agreed to pay 9.2 percent of the taxes assessed against the shopping center. The term "taxes" is defined in section 4.2(a) to include "all real estate taxes, assessments, *water* and sewer *rents* and other governmental impositions and charges . . . nonrecurring as well as recurring, special or extraordinary as well as ordinary" (empha-

sis added). The other part of the lease at issue here, section 15.1, provides:

> Tenant [Big Wash] shall be responsible for the cost of all utilities of every kind and nature serving the Premises. If any utility is separately metered, Tenant shall have such meter placed in its own name and pay the cost thereof directly to the provider. If any utility is not separately metered, Tenant shall pay Landlord its share of the cost of such utility within five days after receipt of Landlord's bill therefor. Landlord may, at Tenant's cost and expense, separately meter any utility that is not currently separately metered, and Tenant shall thereafter put such meter in its own name and pay the costs of such services directly to the provider. Landlord also may, at Tenant's sole cost and expense, submeter any utility, and Tenant shall thereafter pay the costs of such utility based on submeter readings or Landlord's reasonable determination of Tenant's use of such utility.

Each store in the shopping center was separately metered for gas and electricity, but not water.

For almost two years Big Wash paid its rent without incident, including its proportionate share of CAM expenses and taxes. Double H, however, did not receive a bill from the District of Columbia for water usage during that period, and thus it did not bill Big Wash or any of the other tenants for this expense. When the District finally sent Double H a water bill for $22,000, Double H initially protested the bill but eventually paid it in full. Soon thereafter, according to the testimony of its vice president, Double H "billed every tenant for part of it, and about $12,000 of it was subsidized because we don't think it's right to pass on the water usage for Big Wash to other tenants."

Then, on March 31, 1997, Double H sent Big Wash a letter stating, "As you are aware, you are the major user of water in the center [but] your monthly CAM charges are not truly reflective of your usage. Therefore, it is necessary to charge you a monthly water fee of $1,000 (effective 1/1/97) to cover the cost of your water usage." Big Wash paid its 9.2 percent of the CAM charges for 1997 but refused to pay the additional water fee because it believed it was not required to do so under the lease. As a result, Double H filed an action in the Landlord and Tenant Branch of Superior Court seeking payment of $6,300 alleged to be in arrears, including $300 in late fees.

Big Wash filed a motion for summary judgment in which it argued that, under the express terms of section 4.2 of the lease, it could be charged for only 9.2 percent of the water usage for the entire center and not for its specific water usage. In opposition, Double H pointed out that section 15.1 of the lease provided that Big Wash was responsible for the costs of all "utilities of every kind and nature" that served the premises, and argued that water should be considered a "utility" within the meaning of section 15.1. In addition, Double H noted that the term "water rents" used in section 4.2 was not defined in the lease and maintained that, in light of the other provisions of the lease, it could not be read to include water consumption. After a hearing, a Superior Court judge denied the motion for summary judgment, concluding that "the interpretation of the lease was ambiguous and therefore an issue of fact to be decided at trial."

The case went to trial several months later before another judge. At trial, the testimony focused primarily on the defini-

tion of "water rents" and on whether that term denoted charges for actual consumption of water or referred to charges for physical improvements to the water and sewer systems. Silas Young, the vice president of Double H, testified that under section 4.2 each tenant would pay for the usage of utilities within its own space. Mr. Young said that "utilities to me includes water, electric, and gas" and that "it was always my understanding that water was going to be billed as a utility." Moreover, "[i]t was always our intention to submeter the center and put in water meters. To be honest about it, we didn't do it. It was an error on our part. Because we wanted to, instead of estimating water, because each tenant uses a different amount of water." [1]

Anne Magruder, an attorney with sixteen years of commercial leasing experience, testified that she had reviewed the lease for Double H. She also stated that "by the time I got the lease ... the utilities had already been determined ... and the lease negotiations were never conducted about utilities after that point." [2] According to Ms. Magruder, the term "water rents" is always found in the real estate tax section of a commercial lease. It is intended to protect the landlord from charges based on the cost to the local government for installing and maintaining the water and sewer lines. She also said that section 4.2 addressed different circumstances from those addressed by section 15.1 of the lease.

As its only witness, Big Wash called Reuben McCormack, the president of the non-profit corporation that sponsored the Big Wash laundromat. Mr. McCormack, after reviewing the lease, concluded that "utilities" covered only gas, electric, tele-

---

1. Apparently, Double H had previously attempted to submeter Big Wash's space but was refused access.

2. Several draft leases were exchanged between the parties before the final version was agreed upon and signed.

phone, and cable television services. He further testified that water was "a governmental assessment under the tax provision" to be billed to the landlord.

At the conclusion of the evidence, on May 27, 1998, the trial court accepted Double H's interpretation of the lease and issued an oral ruling in its favor. Because other matters remained to be decided, a final judgment was not entered at that time. Then, a few weeks later, Big Wash filed a motion asking the court to "revise" its May 27 decision. It argued that the terms "water rents" and "water tax" were used interchangeably in the lease to refer to actual water consumption. It referred to both D.C.Code § 43–1520, in its pre–1996 form, and D.C.Code § 43–1522, with its post–1996 language reflecting the use of the term "water rents" as meaning rates for the use of water. Double H filed an opposition noting that subsequent amendments to the Code deleted the term "water rents" and "substituted the more accurate term 'water rates.'" Accordingly, it maintained that Big Wash's statute-based argument did not provide a sufficient reason to disturb the court's ruling.

After a hearing on the motion, the trial court set aside its earlier decision and ordered judgment to be entered for Big Wash. In so ruling, the court said:

> The court's view at the trial was heavily influenced by the testimony of Anne Magruder ... who attested to the meaning of the term water rents. The meaning of the term water rents is of course the pivotal issue to be decided by the court.
>
> The defendants urged this court to accept [a] different construction of this lease contract in light of what they contended was clear statutory language supporting their position. Having care-

fully reviewed this statutory analysis, the sections of the Code in question, I believe this is a very compelling argument, and clearly, if the language in the Code is contrary to the expert witness' testimony, I believe it must be deferred to.

> How to [construe] the contract clearly depends on relevant statutory authority pertinent to provisions of the contract, and that's consistent with the Supreme Court's ruling in *Norfolk and Western Railway Company*.[3] Title 43 of the Code and its consistent reference and use of the term water rents in a fashion to equate to water consumption convinces the court that its earlier ruling was in error and its reliance on the testimony of Ms. Magruder was not borne out by legal authority.
>
> I find that the lease does not provide the landlord the relief it's requesting in this case. Therefore, I will sign an order granting defendant's motion to revise the court's order of May 27th.

Final judgment was entered thereafter in favor of Big Wash, and Double H. noted this appeal.

## II

At issue here is whether the term "water rents," as used in paragraph (a) of section 4.2 of the lease, refers to actual water consumption or whether water usage is covered by the reference in section 15.1 to "utilities." Double H contends that section 4.2 is ambiguous, whereas section 15.1 is explicit in providing that Big Wash is "responsible for the cost of all utilities of every kind and nature," including water. Accordingly, it urges this court to hold that section 15.1 requires Big Wash to pay the entire cost of its water usage.

---

**3.** *Norfolk & Western Ry. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

■ The District of Columbia adheres to the "objective law" of contracts, which means that the written language will govern the rights and liabilities of the parties unless it is not susceptible of clear meaning, or unless there is evidence of fraud, duress, or mutual mistake. *See Sagalyn v. Foundation for Preservation of Historic Georgetown,* 691 A.2d 107, 111 (D.C.1997); *Hart v. Vermont Investment Ltd. Partnership,* 667 A.2d 578, 582 (D.C.1995); *Howard University v. Best,* 484 A.2d 958, 967 (D.C.1984). We are satisfied that the term "water rents," as used in section 4.2 of the lease, is susceptible of clear meaning and is not ambiguous.

■ Big Wash maintains, and we agree, that laws in effect at the time of the making of a contract form a part of the contract "as fully as if they had been expressly referred to or incorporated in its terms." *Farmers & Merchants Bank of Monroe v. Federal Reserve Bank of Richmond,* 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923); *accord, Norfolk & Western, supra* note 3, 499 U.S. at 129–130, 111 S.Ct. 1156. At the time the parties signed the lease, D.C.Code § 43–1522.5 (1995) defined "water rates" as "those charges made by the District of Columbia government for water services . . . ."[4] In addition, section 43–1526 of the Code stated that "[t]he Mayor of the District of Columbia has authority to provide for the collection of *water rates* . . . from the owner or occupants of all buildings or establishments *using the water*" (emphasis added). In 1996 several provisions in

Title 43 were repealed, and in other sections the term "water rates" was changed to "water rents." Even after the 1996 amendments, however, the Code still used the term "water rates" to refer to actual water consumption. *See* D.C.Code § 43–1526 (1998).[5] For all practical purposes, "water rates" and "water rents" seem to be synonymous.

■ Given this statutory language, it is difficult to conclude that the term "water rents" as used in section 4.2 of the lease means anything other than money to be paid for actual water consumption. Double H argues that it does not refer to actual consumption but fails to offer an alternative meaning. There is no evidence in the record that the parties intended "water rents" to denote costs involved in laying water mains or pipes, as counsel for Double H contended during oral argument. On the contrary, it appears to be well settled that "[w]ater rents or water rates fixed by municipal ordinance for service from a water system owned and operated by a municipal corporation, while they have been referred to as taxes, are ordinarily not taxes, but simply the price charged for the service or for the water as a commodity . . . ." 94 C.J.S. *Waters* § 284, at 162 (1956) (footnotes omitted). That, we conclude, is the situation here.

We therefore hold that, even though section 4.2 of the lease is captioned "Taxes and Assessments," the term "water rents" as used in that section refers not to a "tax" in the ordinary sense, but to the price

---

4. Under prior law, the terms "water rates" and "water rents" were used interchangeably. *See, e.g.,* D.C.Code § 43–1520 (1981); *Quick v. District of Columbia,* 90 A.2d 235, 236 (D.C.1952); *see also Dasey v. Skinner,* 11 N.Y.S. 821 (N.Y.Sup.Ct.1890).

5. In the most recent edition of the Code, section 43–1526 has been recodified as D.C.Code § 34–2401.11 (2001), but the lan-

guage has not been changed. It provides, in pertinent part:

The Mayor of the District of Columbia has authority to provide for the collection of *water rates,* in advance or otherwise, from the owner or occupants of all buildings or establishments *using the water;* and to provide for stopping the supply of water to any dwelling or establishment upon a failure to pay the rate. . . . [Emphasis added.]

charged by the District of Columbia for providing water to the shopping center. We further hold that section 4.2, when read in light of D.C.Code § 43–1522.5 (1995), is not ambiguous, and that under section 4.2 Big Wash is required to pay 9.2 percent of the total charge for water service billed to Double H, but no more. Finally, because section 4.2 determines Big Wash's obligation to pay for water service, we hold that section 15.1, which refers generally to "utilities," does not apply.

Ultimately, what we have here is a poorly drafted lease. Double H could have specified in section 15.1 that water was to be included as a utility, or it could simply have deleted the "water rents" language from section 4.2. As a matter of common sense, Double H should have realized that a laundromat would use more water than other tenants, and Double H was in the best position to ensure that the lease reflected this fact by modifying its language. Double H, however, did not do so, but instead used the general term "utilities" in section 15.1 even though water consumption was specifically covered by another provision of the lease. While the drafter of the lease may have made an obvious error, that fact does not enable the trial court or this court to alter its plain language. We therefore find no error in the trial court's ruling that section 4.2, not section 15.1, determines how much Big Wash is obliged to pay for water consumption.

The judgment is accordingly

*Affirmed.*